Louis Beckenstein et al. *v.*
Potter and Carrier, Inc., et al.
(10958)

Peters, Healey, Parskey, Grillo and Dupont, Js.

Argued April 7—decision released August 16, 1983

*Wesley W. Horton,* with whom were *Alexandra Davis* and, on the brief, *William R. Moller* and *David L. Fineberg,* for the appellants (plaintiffs).

*John Crosskey,* with whom were *Robert Poyourow* and, on the brief, *David J. Elliott,* for the appellee (defendant General Aniline and Film Corporation).

ARTHUR H. HEALEY, J. The plaintiffs in this case, Louis Beckenstein and Henry Beckenstein (plaintiffs), are the owners and developers of the Wintonbury Mall in Bloomfield. There were originally two defendants in the case: Potter & Carrier, Inc. (Potter & Carrier) was a roofing contractor hired by the plaintiffs in 1969 to install a roof on certain buildings in the mall; General Aniline & Film Corporation (GAF) was the manufacturer of certain roofing material utilized by Potter & Carrier in installing the roof. After Potter & Carrier had completed its work, the roof developed leaks and, by 1975, it had to be completely replaced by the plaintiffs at a cost of about $170,000.

The plaintiffs filed the present action against the defendants on January 28, 1975. Potter & Carrier was defaulted for failure to plead before trial. The case against GAF then proceeded to trial before a jury with Judge Corrigan presiding. At the close of all the evidence on November 12, 1980, GAF moved for a directed verdict, which motion was denied by the court. Thereafter, two theories of liability were submitted for the jury's consideration: (1) breach of contract through the agency of Potter & Carrier; and (2) strict liability in tort for providing defective roofing materials. On November 13, 1980, the jury returned a verdict in the plaintiffs' favor in the amount of $211,569. In response to two interrogatories, the jury found that GAF was not liable on strict tort liability,[1] but did find that Potter & Carrier was the agent of GAF.[2]

GAF then moved, pursuant to Practice Book § 321, for judgment notwithstanding the verdict. On August

[1] The plaintiffs have not appealed the jury's finding on their strict liability count.

[2] The first interrogatory, which was answered "yes," stated: "Was Potter & Carrier the agent of GAF?" The second interrogatory which was answered "no," stated: "Was GAF liable on strict tort liability?"

3, 1981, the trial court granted GAF"s motion and rendered judgment in its favor. The plaintiffs have appealed this decision claiming that there was sufficient evidence to support the verdict and finding of the jury that Potter & Carrier was the agent of GAF.[3] We disagree.

In order to assess the plaintiffs' claims, it is necessary to delineate the evidence adduced in the trial concerning three relationships. We will first examine the relationship between Potter & Carrier and GAF. We will then examine the relationship between the plaintiffs and Potter & Carrier. Finally, we will examine the relationship between the plaintiffs and GAF. In reviewing a trial court's action in setting aside a jury's verdict, we are mindful of the fact that the evidence must be considered "in the light most favorable to the plaintiff and every reasonable presumption should be given in support of the correctness of the verdict." *Zarembski* v. *Three Lakes Park, Inc.,* 177 Conn. 603, 604, 419 A.2d 339 (1979); see also *Magnon* v. *Glickman,* 185 Conn. 234, 238, 440 A.2d 909 (1981); *Pelletier* v. *Bilbiles,* 154 Conn. 544, 546, 227 A.2d 251 (1967). We have also noted, however, that the trial court, in ruling on a motion to set aside a verdict, is in a position where it "can sense the atmosphere of a trial and has an excellent vantage point for evaluating the factors that may have brought the jury to its verdict." *Hearl* v. *Waterbury YMCA,* 187 Conn. 1, 3, 444 A.2d 211 (1982). Accordingly, its determination should be given consideration.

---

[3] In the event that this court determined that there was sufficient evidence of agency to support the jury's verdict in favor of the plaintiffs, GAF briefed two claims of error arising from the trial court's charge to the jury. While there was a dispute between the parties as to whether these claims were properly before us, our conclusion that the trial court was correct in rendering a judgment notwithstanding the verdict makes it unnecessary to consider these particular claims.

As early as 1964 Potter & Carrier and GAF entered into an "Approved Roofer's Agreement." Another such agreement was entered into on November 11, 1969, and was renewed on a yearly basis through 1973. Thereafter, Potter & Carrier got into financial difficulty and was no longer an "approved roofer" of GAF.

William Barnett, a technical supervisor for GAF whose area of operation covered the northeast region of the country, testified in regard to the procedures followed by GAF before entering into an "Approved Roofer's Agreement." He stated that the roofer was required to give GAF a list of three jobs it had completed, which GAF went out and inspected. In addition, the roofer had to give GAF a list of projects on which it was currently working, which GAF also inspected. Finally, GAF checked the roofer's financial statements and its arrangement with the "metal men." These procedures were undertaken to ensure that the roofer was both professionally and financially qualified.

Although there is some dispute as to which "Approved Roofer's Agreement" was controlling, in their briefs both parties have relied on the 1969 agreement that was introduced into evidence.[4] There are three preliminary clauses in the agreement which recite the general underpinnings to the agreement. The first clause states, in part, that the "Roofer proposes to apply, from time to time as he receives orders for the same, roofs . . . manufactured by GAF in accordance with specifications to be selected by the roofer from the various specifications contained in the Specifications Catalog issued by GAF entitled RUBEROID BUILT UP ROOFING . . . which book is hereinafter referred to as RUBEROID SPECIFICATIONS BOOK . . . ." The sec-

---

[4] In addition to the 1969 agreement, the 1964 and 1973 "Approved Roofer's Agreements" were introduced into evidence. The plaintiffs' brief states that all the agreements are "similar."

124

ond clause basically states that GAF is willing to furnish such materials as may be required by the roofer. The third clause states that "GAF is willing, subject to the terms and conditions of this agreement, to furnish a surety bond for each roof . . . applied by the Roofer during the term of this agreement, provided that the Roofer . . . applying such roof . . . complies strictly with the particular specification selected by the Roofer from the RUBEROID SPECIFICATIONS BOOK and the applicable recommendations contained therein and such charges . . . which shall be mutually agreed upon in writing . . . ."

Following these preliminary clauses, there are specific agreements between the parties. The plaintiffs rely heavily on the first paragraph as providing a basis for a finding of agency. That paragraph states as follows: "1. GAF agrees to sell to the Roofer and the Roofer agrees to purchase from GAF, at such prices and upon such terms and conditions as may from time to time be established by GAF, such Roofing Felts, Coated Roofing Products, Dubl—Coverage Roofing, Asphalt, Coal Tar Pitch, Primer, and Composition Flashing materials as may be required by the recommendations applicable to the particular specifications selected by the Roofer from the RUBEROID SPECIFICATIONS BOOK for the application of such roof or roof and flashings." The second paragraph provides, in part, as follows: "GAF agrees that in each case where the Roofer applies only a roof without flashing and such roof is applied strictly in conformity with the particular specifications selected by the Roofer from the RUBEROID SPECIFICATIONS BOOK and applicable recommendations therein contained . . . and the Roofer complies with all the other terms, convenants [sic] and conditions of this agreement, GAF will furnish a surety bond in the form attached hereto and made a part of this agreement by

reference, or any modification thereof as may from time to time be made by GAF. . . ." The third paragraph provides that the roofer shall pay for the surety bond and further provides "[t]hat in all cases where the Roofer shall be awarded a contract for such roofing jobs and provided GAF shall be called upon to furnish a bond as aforesaid the Roofer will notify GAF to that effect, using for the purpose of such notification Form 'Notice of Award' a copy of which is annexed hereto and made a part hereof, and the Roofer hereby agrees to furnish all detailed information called for in said 'Notice of Award,' and the Roofer further agrees to give GAF notice of the exact date when work on each job shall begin, said notice to be not less than forty-eight (48) hours before the date of the beginning of such job." Paragraph 5 provides, in part, that the roofer will "provide suitable equipment and . . . employ sufficient experienced workmen to carry on the work without undue delay and in such manner as will enable GAF to inspect such work . . . ." The agreement further provides, in pertinent part, as follows: "6. The Roofer agrees that in any and all cases where GAF shall give notice to the Roofer that the roof deck has not been properly prepared, GAF shall not be required to give any bond or guarantee herein referred to unless said roof deck shall be first put in such condition as may be satisfactory to GAF before the application of GAF materials.

"7. The Roofer agrees (a) to construct each roof and flashing, as the case may be, in strict and complete conformity with the specifications selected by the Roofer from the RUBEROID SPECIFICATIONS BOOK for the application of such roof or roof and flashing, and to comply with all provisions contained in the specifications so selected and applicable recommendations and any changes, additions, and alterations thereto as may be

mutually agreed upon in writing prior to and during the job applications, and (b) that the decision of GAF as to whether the said specifications and the terms of this agreement have been complied with shall be final, and (c) if GAF decides that the specifications have not been complied with, and that additional workmanship and materials are necessary to justify the issuance of the required surety bond, the Roofer agrees to immediately complete the work as directed by GAF.

"8. Immediately upon the completion of any work coming within the terms of this agreement, the Roofer agrees to notify GAF, using for the purpose of such notification Form 'Notice of Completion,' a copy of which is attached hereto and made a part hereof; and the Roofer hereby further agrees to furnish GAF with all information called for in said form 'Notice of Completion,' and to give GAF the Roofer's two (2) year guarantee applicable to said work or job, as provided for in said form 'Notice of Completion.' . . .

"10. If the Roofer shall have an opportunity to bid on any roofing job requiring a surety bond and the use of specifications different from any of those contained in the RUBEROID SPECIFICATIONS BOOK, he agrees to bring the same at once to the attention of GAF in writing for such action, either through the use of a revised specification, or otherwise as GAF may consider advisable in the mutual interest of the Roofer and GAF.

"11. It is hereby mutually agreed that failure on the part of the Roofer to comply with any of the terms, covenants, or conditions of this agreement shall in all cases relieve GAF of any and all obligations whatsoever to give the bond herein referred to on any job or work coming within the terms of this agreement. . . .

"13. This agreement shall not constitute Roofer the agent or legal representative of GAF for any purpose whatsoever. . . ."

In order to qualify for a bond pursuant to the bonding program set forth in the Approved Roofer's Agreement, a roofer is required, inter alia, to send in a "Notice of Completion" form immediately upon the completion of any work coming within the terms of the agreement. One of the conditions set forth in the form is that a roofer agrees to make certain necessary repairs at its own expense for two years following the completion of the project in a manner that is satisfactory to GAF.

The plaintiffs introduced evidence for the purpose of showing how GAF promoted its bonding program. One such document was an internal GAF bulletin containing a "suggested letter" that GAF salesmen could send to architects extolling the virtues of the GAF roofing program which included "application by experienced, qualified roofing contractors," as well as explaining some of the aspects of the bonding program. There was no evidence, however, that this suggested letter was ever received by the architect who designed the roof of the Wintonbury Mall or by the plaintiffs.

In addition, the plaintiffs introduced two of the Ruberoid Specifications Books referred to in this agreement into evidence. The first book was dated 1967, and the second book was dated 1969.[5] Both books contain thirty-five to forty pages of detailed recommendations and specifications regarding various roofing materials and methods of installation for different types of roofs.

The plaintiffs called as a witness Robert Berryman who was the director of operations for Construction

---

[5] There was testimony that "typically" GAF put out a new Ruberoid Specifications Book each year.

Consultants, Inc., of Detroit, Michigan. It was Construction Consultants, Inc., and Berryman in particular, whom the plaintiffs called in, in 1974, to examine the roof some time after the roof had developed leaks. He testified in regard to roofers' agreements in general that a roofer could be approved by up to "half a dozen or more" materials manufacturers. He further testified that it was the architect for a particular project who determined the materials which would be used by the roofer. The roofer, with this information, then selects a particular specification established by the materials manufacturer in determining how to install the roof. In addition, he stated that "typically" a particular roofer was approved based "on their [sic] ability to pay their [sic] bills."

We now turn to the relationship between Potter & Carrier and the plaintiffs. The plaintiffs introduced into evidence three contracts entered into by these two parties to install the roof on three different sections of the Wintonbury Mall. The first is dated August, 1969. The second is dated October, 1969. The final one is dated June, 1970. Each of the contracts is printed on the plaintiffs' forms. In addition, each contract calls for Potter & Carrier to furnish and install, inter alia, a "20 year Bonded Smooth Surface Roof." There is no mention of GAF in any of the contracts. Prior to entering into these contracts, Potter & Carrier submitted three proposals to the plaintiffs. As do the contracts themselves, each of the proposals calls for a "20 year Bonded Smooth Surface Roof," with no mention of GAF. Finally, the roof specifications in the architectural plans did not set forth "any particular brand of roof."

One of the witnesses called by the plaintiffs was William Muller, an employee of the plaintiffs who took care of the contracts that were made for the Wintonbury Mall project. He testified that Jonathan Potter,

the owner or president of Potter & Carrier, "said that [the roof] was guaranteed by Ruberoid [then a division of GAF]," and that the roof "would be bonded for twenty years." In addition, Henry Beckenstein walked in on one conversation between Muller and Potter where Potter proposed installing a new roof with which Ruberoid was coming out.

In regard to the relationship between the plaintiffs and GAF, there was no evidence that the plaintiffs had any direct contact with GAF prior to the construction of the Wintonbury Mall roof.[6] In fact, Henry Beckenstein testified that his first involvement with GAF was in 1974, and that he would have been "surprised" to hear that it had certain guides to the installation of their material. The plaintiffs knew of GAF from the representations of Potter referred to earlier. In addition, Potter & Carrier had installed a roof on another project being developed by the plaintiffs where they did receive a bond from GAF. The bond was dated March 10, 1970, although there was no testimony as to the actual date when the plaintiffs received that bond.

Finally, we must examine the events that occurred after the completion of the roof. On January 20, 1971, Potter & Carrier sent a "Notice of Completion" form to GAF which, according to the Approved Roofer's Agreement, was a prerequisite to a roofer's obtaining a bond.[7] The following day an inspector for GAF, David Muller, filled out a "GAF Bonded Roof Inspection Report." On March 8, 1971, two employees of GAF

---

[6] GAF introduced into evidence a letter dated July 19, 1974, sent by Leslie Nathan, the plaintiffs' attorney at that time, to Potter & Carrier's attorney requesting the latter to provide them with "information as to what company or companies or system or systems were used for the roofs . . . ." On cross-examination Nathan admitted that at one point in 1974 he was not "aware that GAF was involved at all in this matter."

[7] Apparently, however, a "Notice of Award" form indicating that Potter & Carrier had won the Wintonbury Mall project was never sent in to GAF.

inspected the roof, Muller and Regis Cummings. The form filed by David Muller merely indicates that an inspection was made and was signed by an employee of the plaintiffs. Cummings filed an activities report with GAF which noted three deficiencies in the roof. One of these deficiencies was that Potter & Carrier did not follow the instructions contained in the Ruberoid Specifications Book which indicated that the roof was to use three plies of roofing material rather than the two which Potter & Carrier applied. This deficiency would have prevented a roofer from obtaining a bond. In addition, William Barnett testified that Cummings would have known when he inspected the roof that Potter & Carrier had "skimped or cheated on this contract." On March 19, 1971, David Muller sent a speed letter to Potter & Carrier stating: "This roof was inspected last week. As it stands, and through no fault of yours, this roof cannot qualify for a bond. The contractor or air conditioning mechanics have . . . nailed . . . boards to the roof. Also, the lights used to light the walkways are mounted on boards nailed through the membrane. I will be glad to reexamine this roof after these conditions are rectified." There was no mention of Potter & Carrier's failure to install three plies. Barnett testified that there was no reason to omit such information in this letter to Potter & Carrier. Furthermore, no one from GAF informed the plaintiffs about the insufficient number of plies on the roof, although Barnett repeatedly stated during his testimony that this was because GAF had no contract with the plaintiffs and that he felt that GAF could have been held liable to Potter & Carrier if it had.

After Potter & Carrier received the speed letter, Jonathan Potter informed William Muller, the plaintiffs' employee, of the problems it had specified. Even though Potter & Carrier then fixed the holes in the roof,

the roof developed leaks in the winter of 1970–71, the first winter after it had been completed. From 1971 through 1973, Potter & Carrier made intermittent repairs on the roof. In 1974, after the repairs on the roof had been unsuccessful, Construction Consultants, Inc., was finally called in to inspect the roof. In addition, a local company, Eagle Sheet Metal Works, Inc., was called in to examine the roof from the standpoint of either repairing it or replacing it. The plaintiffs then decided to replace the whole roof. In November of 1974, Barnett also inspected the roof, while it was being replaced, and found substantial deficiencies. No bond was ever issued by GAF.

On November 14, 1974, prior to the decision to replace the roof, there was a meeting attended by the plaintiffs, the plaintiffs' lawyer, Leslie Nathan, Barnett and Cummings to discuss the problems of the roof including the failure by Potter & Carrier to apply a sufficient number of plies. Barnett testified that he informed the plaintiffs that although Potter & Carrier was a GAF approved roofer, GAF was not responsible for any of the problems because Potter & Carrier had never sent in a "Notice of Award" prior to starting the job and that no inspection had been made of the project while it was going on. Henry Beckenstein testified that he remembered "distinctly" Barnett's telling them that Potter & Carrier was "an approved applicator" of GAF roofing materials. Attorney Nathan, who represented the plaintiffs, testified, however, that Barnett had indicated "that Potter and Carrier were approved agents for GAF in the installation of their designed roofs . . . ."

As was previously noted, after the jury had returned a plaintiffs' verdict on the theory that Potter & Carrier was GAF's agent, the trial court directed judgment notwithstanding the verdict in GAF's favor pursuant to

Practice Book § 321. In its memorandum of decision, the trial court concluded that the Approved Roofer's Agreement contemplated no control of Potter & Carrier by GAF which, it noted, is an essential factor in an agency relationship, citing *McLaughlin* v. *Chicken Delight, Inc.,* 164 Conn. 317, 322, 321 A.2d 456 (1973). It also rejected the claim that Potter & Carrier was the apparent agent of GAF because there was no direct contact between the plaintiffs and GAF.

On appeal, the plaintiffs claim that there was sufficient evidence for the jury to find an agency relationship on the basis of either of the aforementioned theories. The claim under each doctrine will be addressed separately. The plaintiffs also claim, however, that the jury could have found an agency relationship on the basis of the doctrine of implied ratification. The short answer to this claim is that the trial court never instructed the jury on implied ratification. The plaintiffs have not raised any claim of error in regard to the charge. Hence we will not review it. *Lee* v. *Lee,* 174 Conn. 5, 7, 381 A.2d 529 (1977). In this case, therefore, we "dispose of the case on the theory on which it was tried and on which the trial court decided it."[8] *Machiz* v. *Homer Harmon, Inc.,* 146 Conn. 523, 525, 152 A.2d 629 (1959).

"Agency is defined as ' "the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act . . . ." Restatement (Second), 1 Agency § 1.'

---

[8] The plaintiffs also claim that we should reinstate the jury's verdict on the theory that GAF so "insinuated" itself into the transaction between the plaintiffs and Potter & Carrier that they should incur any of Potter & Carrier's liabilities. Besides the fact that the authority cited by the plaintiffs for this proposition is inapposite to the facts of this case, this theory was never presented to the jury and, therefore, we will not consider it. *Machiz* v. *Homer Harmon, Inc.,* 146 Conn. 523, 525, 152 A.2d 629 (1959).

*McLaughlin* v. *Chicken Delight, Inc.,* 164 Conn. 317, 322, 321 A.2d 456 (1973). Thus, the three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking. Restatement (Second), 1 Agency § 1, comment b (1958)." *Botticello* v. *Stefanovicz,* 177 Conn. 22, 25, 411 A.2d 16 (1979); see also *Long* v. *Schull,* 184 Conn. 252, 256, 439 A.2d 975 (1981). The existence of an agency relationship is a question of fact. *Botticello* v. *Stefanovicz,* supra, 26; *Conte* v. *Dwan Lincoln-Mercury, Inc.,* 172 Conn. 112, 124, 374 A.2d 144 (1976). Some of the factors listed by the Second Restatement of Agency in assessing whether such a relationship exists include: whether the alleged principal has the right to direct and control the work of the agent; whether the agent is engaged in a distinct occupation; whether the principal or the agent supplies the "instrumentalities, tools, and the place of work"; and the method of paying the agent. See 1 Restatement (Second) Agency §§ 14, 220; see generally *General Building Contractors Assn.* v. *Pennsylvania,* 458 U.S. 375, 391–92, 102 S. Ct. 3141, 73 L. Ed. 2d 835 (1982); *Nicholas* v. *Moore,* 570 P.2d 174, 176–77 (Alaska 1977); *Hampton* v. *McCord,* 141 Ga. App. 97, 98–99, 232 S.E.2d 582 (1977); *Bloedel Timberlands Development* v. *Timber Industries, Inc.,* 28 Wash. App. 669, 674, 626 P.2d 30 (1981); Seavey, Agency (1964) §§ 6, 84. In addition, "[a]n essential ingredient of agency is that the agent is doing something at the behest and for the benefit of the principal." (Citations omitted.) *Leary* v. *Johnson,* 159 Conn. 101, 105–106, 267 A.2d 658 (1970). Finally, the labels used by the parties in referring to their relationship are not determinative; rather, a court must look to the "operative terms" of their agreement or

understanding. *Slate* v. *International House of Pancakes,* 90 Ill. App. 3d 716, 727, 413 N.E.2d 457 (1980); *Chevron Oil Co.* v. *Sutton,* 85 N.M. 679, 681, 515 P.2d 1283 (1973); *Beasley* v. *Kerr-McGee Chemical Corporation,* 273 S.C. 523, 526, 257 S.E.2d 726 (1979).

Turning to the facts of the present case, we cannot conclude that the trial court erred in determining that there was insufficient evidence to create an agency relationship between GAF and Potter & Carrier. In this regard, we look first to the Approved Roofer's Agreement to determine whether there was a manifestation of consent by GAF that Potter & Carrier should act on behalf of GAF and subject to GAF''s control and the consent by Potter & Carrier so to act. See *McLaughlin* v. *Chicken Delight, Inc.,* supra, 322. In so doing, we note that the agreement must be interpreted as a whole, with all relevant provisions considered together. *Lanna* v. *Greene,* 175 Conn. 453, 458, 399 A.2d 837 (1978); *Lar-Rob Bus Corporation* v. *Fairfield,* 170 Conn. 397, 407, 365 A.2d 1086 (1976). We conclude that the factors which determine whether an agency relationship exists simply cannot be found in the agreement.

The first element is the right to control the day-to-day work of the alleged agent. The plaintiffs rely heavily on paragraph 1 of the agreement as giving such a right to GAF. That paragraph provides, in pertinent part, that "GAF agrees to sell to the Roofer and the Roofer agrees to purchase from GAF, at such prices and upon such terms and conditions as may . . . be established by GAF, such . . . materials as may be required by the recommendations applicable to the particular specifications selected by the Roofer . . . ." This clause is simply an agreement to buy and sell materials. The only way its interpretation could even possibly be expanded to implicate a right to control is

if one of the "conditions" for GAF"s selling a product to Potter & Carrier was that Potter & Carrier agreed to submit itself to GAF"s control. Not only was there no evidence of this type of agreement between GAF and Potter & Carrier in regard to the materials GAF sold to Potter & Carrier to be installed on the Wintonbury Mall roof, but this type of condition would have been inconsistent with the rest of the Approved Roofer's Agreement. For example, the second paragraph of the agreement states that GAF will furnish a surety bond in each case where the roofer applies GAF"s materials in strict conformity with the Ruberoid Specifications Book referred to earlier. It does not say that Potter & Carrier *must* follow those specifications. Paragraph 3 of the agreement has similar conditional language. It provides that Potter & Carrier must take certain action *"provided* GAF shall be called upon to furnish a bond . . . ." (Emphasis added.) In other words, Potter & Carrier was relieved of *any* obligation to comply with GAF specifications if it did not want a bond. A separate agreement giving GAF the right to control Potter & Carrier's work, therefore, would be inconsistent with the conditional language of the roofer's agreement.

In paragraph 5 the roofer "agrees in all cases to provide suitable equipment and to employ sufficient experienced workmen to carry on the work without undue delay and in such manner as will enable GAF to inspect such work with a minimum of expense." Reading the agreement as a whole, however, it is clear, both from the agreement itself and the Ruberoid Specifications Book, that the inspection is part of the GAF bonding program. If the roofer elects not to seek a bond, therefore, this provision in the agreement from GAF need not be followed.

Paragraph 7 of the agreement is also cited by the plaintiffs. It provides that the "Roofer agrees (a) to construct each roof . . . in strict and complete conformity with the specifications selected by the Roofer from the RUBEROID SPECIFICATIONS BOOK . . . ." If this was all the paragraph stated it might have been some evidence of control. The same sentence continues, however, stating that "if GAF decides that the specifications have not been complied with, and that additional workmanship and materials are necessary to justify the issuance of the required surety bond, the Roofer agrees to immediately complete the work as directed by GAF." We have already noted that the decision to apply for a bond is only an option, and not an obligation, to be exercised in the discretion of the roofer. The only reasonable interpretation of paragraph 7, therefore, is that if the roofer decides to apply for a bond, *then* the roofer must construct the roof in strict conformity with the specifications.

Finally, paragraph 11 provides that a failure by the roofer to comply with any of the terms of the agreement relieves GAF of the obligation to issue a bond. No other powers or rights are afforded to GAF. For example, GAF has no right to replace one approved roofer with another on any particular project. See generally *Aweida* v. *Kientz*, 536 P.2d 1138 (Colo. App. 1975). This agreement, therefore, gives GAF no right to control the day-to-day operations of Potter & Carrier.

An examination of some of the other factors utilized in determining whether an agency relationship could reasonably be found to exist further indicates that the agreement between GAF and Potter & Carrier falls short of establishing such a relationship. There is no evidence that GAF controlled either the instrumentalities or place of work. In fact, the agreement anticipates

quite the opposite. It is only when the roofer has been awarded a job that the agreement will have any potential force. GAF does not direct the roofer as to which jobs to undertake. Similarly, GAF "sells" its materials to the roofer pursuant to the agreement. Under the agreement, it does not "supply" any materials or instrumentalities for completing a particular job in the sense that it retained an ownership interest in them. This factor would have provided some indication that Potter & Carrier was restricted in its use of the roofing materials and was subject to the direction or control of GAF as to how to sell and install them. See *Narragansett Wire Co.* v. *Norberg,* 118 R.I. 596, 376 A.2d 1 (1977); cf. *K. King & G. Shuler Corporation* v. *King,* 259 Cal. App. 2d 383, 395, 66 Cal. Rptr. 330 (1968).

Finally, there was also no evidence that GAF owned Potter & Carrier. "Independent ownership of a substantial enterprise is an important factor to be considered on the issue of control. An independent owner is less likely to submit to the control of others in the operation of its business than a non-owner." *Ortega* v. *General Motors Corporation,* 392 So. 2d 40, 43 (Fla. App. 1980).

We have noted that the labels which the parties attach to their descriptions of their relationship is not a conclusive factor. In this case, however, where the provision in the agreement disclaiming an agency relationship is consistent with the provisions of the rest of the agreement, that statement can and should be given credence as indicative of the intent of the parties.

One last aspect of this agreement should be noted. The agreement does anticipate some element of control by GAF but only under certain circumstances. These circumstances are limited only to those instances

where the roofer plans to obtain a bond from GAF. Therefore, the only situation in which GAF could possibly exercise any control is where the roofer is working for its own benefit, i.e., obtaining a bond, and not the benefit of GAF. This contravenes "an essential ingredient of agency," which is that in order to find an agency relationship, the agent must be working at the behest and for the benefit of the principal. *Leary* v. *Johnson,* 159 Conn. 101, 267 A.2d 658 (1970); *Levitz* v. *Jewish Home for the Aged, Inc.,* 156 Conn. 193, 195, 239 A.2d 490 (1968); see also *Alvarez* v. *Felker Mfg. Co.,* 230 Cal. App. 2d 987, 999, 41 Cal. Rptr. 514 (1964); *Narragansett Wire Co.* v. *Norberg,* supra, 605.

In their brief, the plaintiffs cite four factors which they claim the jury could properly consider in order to justify a finding of agency. The first was an alleged declaration by Barnett in November, 1974, that Potter & Carrier was the "approved agent" of GAF. The plaintiffs did not, however, introduce any evidence demonstrating that Barnett had the authority to make such a statement which would be binding on GAF. There was evidence that Barnett was a technical supervisor for the northeast whose responsibilities included, inter alia, educating salesmen to handle any job or problem too large or complicated for the man in the territory and to make architectural calls. This evidence, however, does not establish any authority to make a statement concerning the legal relationship between GAF and a particular roofing contractor. See, e.g., *Morse* v. *Consolidated Ry. Co.,* 81 Conn. 395, 399, 71 A. 553 (1908); *Makoviney* v. *Svinth,* 21 Wash. App. 16, 25–26, 584 P.2d 948 (1978). We cannot find, therefore, that the statement was competent evidence upon which to find an agency relationship.

The second factor cited by the plaintiffs is that GAF did not send a notice to the plaintiffs regarding the find-

ing of the 1971 inspection by Cummings that an insufficient number of plies was used on the roof by Potter & Carrier. The plaintiffs claim that this is evidence of a "coverup" by GAF and should be circumstantial evidence that GAF knew it was responsible for Potter & Carrier's work. The plaintiffs introduced no evidence indicating any obligation on the part of GAF to perform such a task. In fact, the evidence was to the contrary in that GAF"s agreement was only with Potter & Carrier. Therefore, not only is the inference which the plaintiffs seek to draw from this "coverup" impermissible, but the inference itself has no bearing on whether GAF had any right to control the day-to-day work of Potter & Carrier—the critical factor which we have found totally lacking in this case.

The third factor cited by the plaintiffs likewise provides no support for their position. They claim that Barnett, a representative of GAF, inspected the roof at a time in 1974 when it knew that the roof could not be bonded. Accordingly, they assert that the only reason for doing so was that it knew it was responsible for the defective roof. The short answer to this claim is that Barnett inspected the roof pursuant to a request to do so by the plaintiffs' attorney at that time.

Finally, the plaintiffs claim that through GAF"s bonding program and sales advertising it was holding out its roofers as "experienced" and "qualified," and that through contractors like Potter & Carrier, it was able to build a "nationwide bonding program." The fallacy with this proposition is that it shows no evidence of GAF"s right to control the day-to-day work of Potter & Carrier. There can be little doubt that GAF receives a derivative benefit from this bonding program by having its products installed in a professional manner which, in turn, should induce other builders to install its products. The fact that GAF receives such a deriva-

tive benefit, however, is no substitute for establishing the essential elements of an agency relationship. See *Murphy* v. *Holiday Inns, Inc.,* 216 Va. 490, 495, 219 S.E.2d 874 (1975).

We conclude that the trial court properly determined that there was insufficient evidence to establish an agency relationship. The agreement between the parties gave no right of control to GAF over Potter & Carrier's day-to-day activities and there was no indication of a mutual assent by the parties to establish an agency relationship. In this situation, the specific provision disclaiming such an intention was entirely reasonable and consistent with the rest of the agreement and the evidence. In addition, although an agency relationship need not be established by an express agreement, the circumstantial evidence presented in this case provided an insufficient substitute. See *Cafeterias, Inc.* v. *System-Master, Inc.,* 490 S.W.2d 253 (Tex. Civ. App. 1973).

The plaintiffs' second theory on appeal is that there was sufficient evidence presented in this case to justify a jury's finding that Potter & Carrier was the "apparent" agent of GAF. " 'Apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses.' *Lewis* v. *Michigan Millers Mutual Ins. Co.,* 154 Conn. 660, 665, 228 A.2d 803 (1967); see Restatement (Second), 1 Agency § 8 (1958). Apparent authority thus must be determined by the acts of the principal rather than by the acts of the agent. *Nowak* v. *Capitol Motors, Inc.,* 158 Conn. 65, 69, 255 A.2d 845 (1969)." *Botticello* v. *Stefanovicz,* supra, 25–26 n.2; see also *Cohen* v. *Holloways', Inc.,* 158 Conn. 395, 407, 260 A.2d 573 (1969). Furthermore, the party seeking to impose liability upon the principal must demonstrate that it acted in good faith based upon

the actions or inadvertences of the principal. *Cohen* v. *Holloways', Inc.,* supra, 407; *Lewis* v. *Michigan Millers Mutual Ins. Co.,* supra, 665–66. It follows from this principle that if the third party, the plaintiffs in this case, did not know or did not rely upon any action or statement of GAF prior to entering into its agreement with Potter & Carrier, no liability can be imposed based upon the doctrine of apparent authority. See *Botticello* v. *Stefanovicz,* supra; *Lewis* v. *Michigan Millers Mutual Ins. Co.,* supra, 666.

In the present case, there is no evidence that the plaintiffs entered into the agreement with Potter & Carrier on the basis of any action or statement by GAF that Potter & Carrier was its agent. The only evidence that was introduced that was related to this issue was the fact that the plaintiffs received a bond from GAF for another roof that Potter & Carrier had installed for a project being developed by the plaintiffs. There was no evidence, however, that the plaintiffs relied on this bond as evidence that they were dealing with an agent of GAF. In addition, Henry Beckenstein testified that his first contact with anyone from GAF was in 1974, over three years after the roof had been completed. Under these circumstances we cannot conclude that the trial court erred in determining that the plaintiffs failed to establish that Potter & Carrier was the apparent agent of GAF.

There is no error.

In this opinion the other judges concurred.