[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT EXXON MOBIL'S MOTION FOR SUMMARY JUDGMENT (#214)
This litigation concerns a tragic explosion that occurred in Danbury, Connecticut on May 19, 1999, resulting in the loss of life, personal injuries to surviving victims, and property damage. In the revised complaint, which is nearly 900 pages long, the plaintiffs essentially contend that the defendants have various interests in neighboring properties used for gasoline service stations, and these defendants are responsible for the explosion. The plaintiffs' theory is that as a result of spills on at least one of the defendants' properties, gasoline or gasoline products migrated to the building that exploded on May 19, 1999. The explosion was preceded by a torrential rain storm, according to the plaintiffs, which resulted in gasoline products migrating from one of the defendants' properties to the area where the explosion occurred.
The site of the explosion was 35 Wildman Street in Danbury, Connecticut. At least three gasoline stations are located within one mile of that address, including the defendant Courtesy Mobil station owned by Sammy El Jamal, an Exxon Mobil Corporation (EMC) franchisee. Both Courtesy Mobil and EMC have been named as defendants in this case. It is undisputed that EMC has no ownership interest in the gas station's premises, fixtures, equipment or underground storage tanks.
The franchise relationship between El Jamal and Mobil Oil Corporation (the predecessor corporation to Exxon Mobil Corporation) is set forth in a PMPA Motor Fuels Franchise Agreement (PMPA Agreement) dated October 15, 1996. Pursuant to the PMPA Agreement, the franchisee El Jamal has the right to use EMC's trademarks in connection with the sale of Mobil gasoline. Other terms include: requirements for minimum monthly deliveries of gasoline; exclusive use of Mobil brand products; exclusive storage of Mobil brand products; requirement of fixed operating hours pursuant to the defendant's national hours policy; and operation standards including appearance, manpower and maintenance requirements. The PMPA CT Page 12031 Agreement permits EMC a right of entry at any reasonable time for purposes of inspections and other actions to preserve the quality of Mobil products or the integrity of its trademarks or brand names. El Jamal retains the right to make all hiring, firing and salary decisions regarding his employees. He maintains his own books and records and is solely responsible for his tax obligations. Under the franchise agreement at article VII, section B, El Jamal is obligated at his expense to maintain all underground storage tanks which he owns and controls. He is obligated under article VIII of the PMPA Agreement, section C, to "comply fully with all applicable law with respect to water, soil and air environmental protection, including waste disposal." El Jamal hires vendors and contractors to handle the tanks' maintenance, without any involvement by EMC.
The PMPA Agreement specifically states that it shall not create any agency or employment relationship between Mobil and the franchisee.
In their complaint, the plaintiffs' claims against EMC lie in negligence (counts five and twenty) and nuisance (count twenty-one). In paragraph 3 of each count, the plaintiffs allege that EMC "was the supplier and/or franchisor and/or operator and/or owner of the retail petroleum station located at 282 White Street, Danbury, Connecticut. . . ." In paragraph 4 of each count, the plaintiffs allege that EMC "maintains substantial control over the operations, management, practices, purchasing, training, record keeping, maintenance, safety procedures, gasoline storage, underground tank testing and other aspects of the operation of said retail petroleum station." In paragraph 10 of each count, the plaintiffs allege that their injuries "were directly and proximately caused by the negligence and/or carelessness of the defendants, their agents, servants and employees. . . ."
In its motion for summary judgment, EMC asserts that there is no evidence of an ownership, operation or a principal-agent relationship which might serve to hold this defendant liable to the plaintiffs. EMC argues that in the absence of an ownership, operation or a principal-agent relationship, it owed no legal duty to the plaintiffs, the breach of which proximately caused their injuries and damages. The plaintiffs have opposed the motion for summary judgment on the basis that EMC dominated and controlled the operation of the Courtesy Mobil station and therefore liability attaches as a result of a principal-agent relationship.
"Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and CT Page 12032 that the moving party is entitled to judgment as a matter of law. . . . A material fact is a fact that will make a difference in the result of the case. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue as to all material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . (Citation omitted; internal quotation marks omitted.) DaCruzv. State Farm Fire Casualty Co., 69 Conn. App. 507, 511, (2002). "In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact, but rather to determine whether any such issues exist. . . ." (Citation omitted.) Nolanv. Borkowski, 206 Conn. 495, 500, 538 A.2d 1031 (1988).
There is no dispute that EMC does not have an ownership interest in either the Courtesy Mobil station or its underground storage tanks. It also is clear that the operation of the station is controlled by EMC's franchisee, El Jamal, and not the defendant EMC. The franchisee makes all hiring, firing and employment decisions. Under the franchise contract, he hires contractors and vendors to handle maintenance of the underground storage tanks, and he assumes responsibility for environmental problems that may arise.
The plaintiffs' primary opposition to the motion for summary judgment is based on the assertion that the franchisee is an agent of EMC and therefore vicarious liability would apply. In support of this argument, the plaintiffs cite the PMPA Agreement, noting the requirement that the franchisee comply with various rules and standards. The standards include: compliance with the national hours of operation; appearance of a business; requirement that the operator and all employees wear Mobil approved uniforms; employees render prompt, efficient and courteous service; employees be proficient in English; and that the dealer attend Mobil training programs and provide ongoing training to employees.
The plaintiffs note that the PMPA Agreement contains 11 safety guidelines and 11 appearance guidelines. The ongoing evaluation of the franchisee's compliance includes such things as the standard compliance evaluation dated December 7, 1998, which has 98 separate compliance areas. The one deficiency noted in this evaluation, relating to the absence of a customer relations decal with a 1-800 number, was subject to a direction to make the decal available "ASAP." There also was a standard compliance evaluation relating to a car wash operated by the franchisee, listing 48 criteria. CT Page 12033
The plaintiffs also note the requirement in the PMPA Agreement that the franchisee execute a document allowing EMC to deliver gasoline when the station was closed, and requiring the franchisee to abide by EMC's "unleaded gasoline handling procedures." The franchisee also was required to certify that it was in compliance with certain upgrades mandated by the United States Environmental Protection Agency and state law. The plaintiffs also point out that EMC has expended funds for signage and controlled the signage that identifies the property as an EMC station. The EMC expenditures on the signage were reimbursed by the franchisee.
The plaintiffs correctly argue that an agency relationship between EMC and its franchisee El Jamal would have to exist before EMC could be held vicariously liable for their injuries and damages. "Agency is defined as the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the others so to act. . . . Thus, the three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking. The existence of an agency relationship is a question of fact. . . . Some of the factors listed by the Second Restatement of Agency in assessing whether such a relationship exists include: whether the alleged principal has the right to direct and control the work of the agent; whether the agent is engaged in a distinct occupation; whether the principal or the agent supplies the instrumentalities, tools and the place of work; and the method of paying the agent. . . . In addition, an essential ingredient of agency is that the agent is doing something at the behest and for the benefit of the principal. Finally, the labels used by the parties in referring to their relationship are not determinative; rather, a court must look to the operative terms of their agreement or understanding. . . ." (Citations omitted; internal quotation marks omitted.) Beckenstein v. Potter Carrier, Inc., 191 Conn. 120,132-34, 464 A.2d 6 (1983).
In conducting the agency analysis in the Beckenstein case, our Supreme Court first considered the agreement between the parties to determine whether it manifested consent by the principal that the agent should act on its behalf and subject to its control, as well as consent by the agent so to act. Id., 134. The PMPA Agreement clearly provides that the contract does not create an agency or employment relationship between the franchiser and franchisee. Also see Lifeline Products, Inc. v. Blue Cross Blue Shield of Connecticut, Inc., Superior Court, judicial district of New Haven, Docket No. 365530 (July 24, 1998, Downey, J.), where, under CT Page 12034 a similar analysis, the trial court found that although the contract language was not dispositive, it was evidence of the intent of the contracting parties not to create an agency relationship. There is no question in this case that the PMPA Agreement reflects the intent of both contracting parties that no agency relationship would be created.
In its review of an alleged agency relationship, the court inBeckenstein also looked to whether there was evidence of an ownership interest, citing with approval Ortega v. General Motors Corporation,392 So.2d 40, 43 (Fla.App. 1980) "Independent ownership of the substantial enterprise is an important factor to be considered on the issue of control. An independent owner is less likely to submit to the control of others in the operation of its business than a non-owner."Beckenstein, 191 Conn. App. 137.
The Bechenstein court considered other factors listed in the Second Restatement of Agency and concluded that the Approved Roofer's Agreement between GAF as the materials supplier and Potter Carrier as the materials purchaser fell short of establishing an agency relationship, for the following reasons: lack of evidence that GAF controlled either the instrumentalities or place of work; lack of evidence that GAF directed the roofer regarding which jobs to undertake; no evidence of ownership interest retained by GAF in the supplied materials, considering that Potter Carrier was not restricted in its use of the roofing materials, nor were they subject to the direction or control of GAF as to how to sell and install them. Likewise in this case, the instrumentalities, tools and the place of work are not provided by EMC, other than the gasoline being provided by EMC. The gas station, underground tanks, etc. are all the property of the franchisee. The signage is provided by EMC but it is the property of the franchisee. The franchisee is engaged in a distinct occupation in that it is a retail provider of gasoline and automobile related products, including a car wash at its facility.
The control of the work of the agent by the alleged principal is of course an additional factor to be considered under the Restatement analysis. In McLaughlin v. Chicken Delight, Inc., 164 Conn. 317,321 A.2d 456 (1973), the court considered whether the trial court erred in finding after trial that the franchisee was not the agent of the franchisor. The case involved an action to recover damages for the death of the plaintiff's decedent who was struck and killed by the operator of a delivery vehicle owned by a Chicken Delight franchisee. The court upheld the trial court's determination that the plaintiff failed to establish an agency relationship. CT Page 12035
The franchise agreement at issue in McLaughlin provided that the franchisee had the exclusive right to use the name, symbols, method and systems of operation of Chicken Delight at a store located in East Hartford. The agreement was designed to control the quality, uniformity and taste of all the Chicken Delight products sold. The franchisor had the privilege of complete inspection of the business and books of the franchisee. The franchisee was required to deliver promptly to customers hot and freshly prepared foods from a Chicken Delight store. The franchisee was obligated to maintain and provide delivery vehicles and adequate delivery service. The franchisee owned and operated the store, and it owned the motor vehicle which was involved in the accident. The franchisee hired and instructed the driver on how to make deliveries.
The packaged food to be sold was limited and the only name that could be used was "Chicken Delight," and the place of business had to be known as "Chicken Delight." The precise method and manner of cooking was specifically defined. The franchisee had to purchase numerous articles and equipment stated by the franchisor to be essential. The equipment had to be purchased from the franchisor with the standards prescribed by it. The franchisee was required to sell its food in a container bearing the Chicken Delight trademark, and was compelled to buy its entire requirements for the various packaging kits defined by the franchisor. The business could be conducted only at an approved location and the construction and remodeling had to meet the franchisor's standards. The preparation and cooking of all foods had to meet specific Chicken Delight standards.
On the basis of these facts, the trial court concluded that "[a]lthough the financial interest of Chicken Delight, Inc., is advanced and the reputation and good will of Chicken Delight, Inc., are enhanced by the delivery of hot Chicken Delight food products, such is not sufficient to establish a basis for the imposition of liability on Chicken Delight, Inc." Id., 321. The Supreme Court concluded at 164 Conn. 324: "the above findings . . . and others found by the court amply support its conclusion that the plaintiff has failed to establish the requisite agency relationship claimed. This conclusion cannot be disturbed." This result most likely stems from the fact that the franchisee and not Chicken Delight owned the vehicle and employed the vehicle's operator at the time of the accident. Similarly, the franchisee and not EMC owned the underground storage tanks in this case, and was solely responsible for their maintenance at the time of the accident in suit. EMC relies onMcLaughlin as controlling Connecticut authority on the issue of agency and vicarious liability of a franchisor in a franchise relationship.
Rather than seeking to establish an ownership interest where none CT Page 12036 exists, the plaintiffs primarily focus their agency argument on the control of the Courtesy Mobil operation by EMC, citing Bieluczyk v. CrownPetroleum Corp., 134 Conn. 461, 58 A.2d 380 (1948). First, however, the court points out that the control of the franchisor in McLaughlin was at least as extensive as that of EMC in this case. The nature of the product, being food, would invite even greater control by Chicken Delight. EMC's marketing interests essentially would be identical to Chicken Delight's.
Moreover, the plaintiffs' reliance on Bieluczyk is misplaced. That decision is distinguishable because it involved a workers' compensation claim by a gas station mechanic employed at a gas station owned by the defendant oil company. The question was whether the plaintiff was an employee of the named defendant acting within the scope of his employment. The nature of the claim, brought under the workers compensation statute, and ownership of the gasoline service station by the franchisor, creates a substantially different case from the one before this court.
The plaintiffs also cite Chevron Oil Co. v. Sutton, 85 N.M. 679,515 P.2d 1283 (1973). In that case, the plaintiff's decedent died as a result of a faulty repair to a motor vehicle. The Supreme Court of New Mexico found an agency relationship between the franchisor Chevron and its franchisee, the operator of the retail gasoline station and auto repair shop. The court relied on facts including the identification of the franchise as a Chevron business, payment for products and repair by use of a Chevron credit card, and the plaintiff's reliance upon Chevron's reputation in choosing to have her car repaired at the station. The New Mexico Supreme Court in Ciup v. Chevron USA, Inc., 122 N.M. 5371928 P.2d 263 (1996), later distinguished Chevron Oil Company v. Sutton, finding that no agency relationship existed where the franchisor (again Chevron) exercised control over the gas station operation only as necessary to protect its trademark. The court held that protecting a trademark does not constitute sufficient control over the gas station's operation to establish an agency relationship.
That holding would be consistent with McLaughlin v. Chicken Delight, supra, 164 Conn. 317. The Ciup court distinguished its earlier decision also on the principle that the Sutton case involved the plaintiff's reliance on Chevron's reputation to provide skillful and reliable repair services.
Reliance is not an issue in the case before this court. Applying the analysis in the Beckenstein decision, the court finds that the PMPA Agreement specifically evidences the intent of the franchisor and CT Page 12037 franchisee that no agency relationship be created. The ownership of the station, underground storage tanks, and related equipment and facilities also is indicative of the absence of the control necessary to support a finding of agency. The McLaughlin decision is authority for the proposition that protecting a trademark offers insufficient control to establish an agency relationship. This determination is particularly correct under facts such as in this case, where there can be no reliance claimed by the plaintiffs on the Exxon Mobil signage.
The court is aware that the question whether an agency relationship exists is one of fact. It also is noted that both the Beckenstein andMcLaughlin cases went to trial, as opposed to this case in which the issue of agency is before the court on a motion for summary judgment. In this case, however, where the evidence with respect to the franchise agreement, ownership and control of the operation is undisputed, it is appropriate to resolve the agency issue by means of summary judgment.
The motion for summary judgment (#214) is granted.
ROBERT F. McWEENY, J. CT Page 12038