[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
THE FACTS CT Page 5876
The plaintiff was the founder, owner and operator of "La Bagatelle", a retail jewelry business with stores in Stamford and New Canaan. The building in which the New Canaan store was located was owned by J. Elliott Smith ("landlord").[1] The plaintiff had a lease which expired August 31, 1985.
In 1980 the plaintiff hired the defendant[2] Baerbel Green ("defendant") to work part-time as a sales clerk. In 1983 the plaintiff extended the defendant's employment to become her only full-time employee in the New Canaan store. In 1984 the plaintiff promoted the defendant to manager of both New Canaan and Stamford stores. In such capacity the defendant became a friend in whom the plaintiff placed her confidence. As manager the defendant was responsible for all financial matters in both stores including payroll, payment of bills and purchasing. Because the plaintiff was spending most of her time in the State of Georgia where her husband retired the plaintiff relied on and trusted in the defendant in her absence.
In mid-1984 plaintiff approached the defendant with the prospect of a partnership. After discussing the partnership proposal with her husband, the defendant Robert Green, the defendant made a counter-proposal to the plaintiff and offered to purchase the business outright. After some negotiation the offer was accepted and was reduced to a written agreement ("binder") drafted by the defendant Robert Green and signed by the parties including Robert on April 15, 1985. The binder specified a price of $95,000 with a deposit of 10% to be paid: $475 on the signing of the binder and $9,025 on the signing of a superseding contract to be executed on or before May 24, 1985. The defendants paid the $475 on signing of the binder. The binder was made contingent (1) on the defendant's ability to obtain financing for the purchase of the business and (2) the ability to obtain a lease for the existing store premises for five years or more beginning on or before September 1, 1985. In accordance with the terms of the binder, on or about April 25, 1985, the defendant received a contract of sale drafted by the plaintiff's attorney which essentially restated the terms set forth in the binder and called for a closing to be held on August 31, 1985. The defendants never signed the contract of sale and never paid the balance of the 10% as required by the binder, even though at the time the defendant had sold their house and were in a financial position to do so. The defendant gave the excuse that it made no sense to do so since "they had the binder", notwithstanding that the binder contemplated the signing of a contract of sale on or before May 24, 1985. This excuse is found to be unjustified and not credible.
In April the plaintiff wrote two letters to the landlord which authorized the defendant to negotiate directly for a lease of the premises. The conduct of the defendant acting pursuant to this CT Page 5877 authorization and the resolution of the two contingencies comprise the remainder of the facts which form the basis of this lawsuit. These will be discussed as each of the plaintiff's claims are considered.
THE PLAINTIFF'S CLAIMS
The plaintiff has alleged and claims to have proved that the defendant: (1) breached the binder agreement; (2) failed to disclose and deliberately misrepresented material information; (3) failed to use reasonable efforts and good faith in performing the contract; (4) tortiously interfered with the plaintiff's attempt to renew the lease herself. In view of the court's ruling on (1), (2) and (3) there is no need to reach (4).
I. Breach of Contract
"[C]ourts in Connecticut imply a promise that a purchaser will exert reasonable efforts" to meet a contingency in a contract, Phillipe v. Thomas, 3 Conn. App. 471, 473 (1985). "Reasonableness . . . is an objective standard involving an analysis of what a person with ordinary prudence would do given the circumstances, without accounting for any particular knowledge or skill. In contracts as in tort cases, `the test is external, not subjective; that is the question is how would a person of ordinary prudence in such a situation have behaved, not how did the defendant in fact behave.'" Id. at 475, quoting Murphy v. Soracco, 174 Conn. 165, 168 (1978). Whether the defendant's actions constituted reasonable efforts to satisfy the contractual condition is a factual determination for the trial court. Id. quoting Lach v. Cahill, 138 Conn. 418 (1951). In ascertaining whether the defendant's actions where reasonable, the defendant's good faith may be relevant. Id., at 476.
We examine now the defendant's conduct in this regard. As to the lease, the defendant did not begin her efforts to obtain a lease until May 13, 1985 when the wrote the landlord a letter asking him for a lease. This was almost a month after the plaintiff obtained his permission to have the defendant negotiate directly. The defendant made no further contact with the landlord until June 27 when she telephoned him to inquire about the lease. That conversation will be described below.
As to the financing contingency the defendant never even applied for financing to raise the $40,500 cash required for the closing until after she told the plaintiff that she no longer wished to purchase the business as will hereafter appear.
The defendant justifies this inaction on the grounds that the plaintiff and the defendant had a "common strategy" to deal with the landlord. This strategy consisted of the defendant not being CT Page 5878 overly assertive in order to avoid antagonizing the landlord who had proved unpredictable and difficult to deal with in the past. Thus, the defendant contends that no amount of additional effort would have resulted in obtaining agreement on a lease any sooner. However, the plaintiff constituted the defendant as her primary negotiator of the lease while she was out of the country sojourning in China. This relationship continued after the plaintiff's return to Connecticut. Numerous events in the defendant's conduct belie her attribution of delay to the so called "common strategy".
Whether the defendant's conduct constituted a breach of contract is inextricably bound up with a consideration of the legal relationship that the plaintiff and the defendant occupied with one another.
II. The Relationship of the Parties
The plaintiff alleges that in assuming the responsibility of negotiating for the lease the plaintiff and defendant were in an agency relationship, thus creating a fiduciary duty which created a commitment of undivided devotion and loyalty which the defendant was required to accord to the plaintiff.[3]
"One of the most comprehensive definitions of agency is that found in Mecham, Agency (3d Ed.) Section 12. The term is there defined as `the legal relation which exists where one person, called the agent, is employed and authorized by the another, called the principal, to represent and act for the latter in his contractual or business dealings with third persons.'" Baskin v. Dan, 4 Conn. Cir. 702 (1967). "An essential ingredient of agency" is that "the agent must be working at the behest of and for the benefit of the principal". Beckenstein v. Potter Carrier, inc.,191 Conn. 120, 138 (1983).
"The relation need not arise from an express appointment and an acceptance, but it is often established from the words and conduct of the parties and the circumstances of the particular case." Baskin, supra at 706. Id. The plaintiff has the burden of proving that an agency existed. Baskin v. Dan, supra. "Agency has to be proven by a preponderance of the evidence. The question of whether an agency has been created by the conduct and acts of the parties is a matter of fact to be determined by the conduct and acts of the parties." Id.
Here, the evidence presented at trial plainly demonstrates that an agency relationship existed between the plaintiff and the defendant not only as master and servant but also as duly authorized negotiator. It must be kept in mind that the defendant was the plaintiff's manager of both Stamford and New Canaan stores since 1984 and in this capacity was responsible for running these CT Page 5879 businesses and making day to day decisions essential to their operation. Moreover, the plaintiff was frequently an absentee owner who entrusted the defendant with unsupervised control while she was out of the country.
Furthermore, in acting as the plaintiff's duly authorized agent the defendant was acting not only for the principal but for herself as well in attempting to obtain this lease. It is obvious that the plaintiff placed implicit trust in the defendant. "The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of the employment". Restatement, 2d, Agency, Section 236, Comment b. Therefore, although the defendant's negotiations with the landlord were an aspect of the sale the defendant was the plaintiff's agent in seeking to obtain the lease. Indeed, section 395 of the Restatement gives an example of a breach of fiduciary duty between principal and agent as follows:
 1. A, a reporter on a newspaper, learns by eavesdropping that his employers are about to renew the lease on the building in which the newspaper is run. He secretly visits the lessor and obtains a lease on his own account. He may be required to hold this lease as constructive trustee for the newspaper.
While the plaintiff here is not seeking a constructive trust, nevertheless the example is applicable and appropriate.
The defendant seeks to distinguish this case by bringing it within the ambit of Taylor v. Hamden Hall School, Inc., 149 Conn. 545
(1962). The defendant claims that her fiduciary responsibilities as the plaintiff's agent did not include her dealings with the landlord because that was a matter outside the scope of the agency relationship. In Taylor, the defendant appealed from the trial court's judgment foreclosing on a mortgage owned by the plaintiff, the widow of the defendant former school's headmaster. In defense of the foreclosure, the defendant school argued that the plaintiff's claim under the mortgage was invalid because her husband had secretly purchased the note and mortgage while he was in a fiduciary relationship with the defendant which was created by his status as headmaster and his regular attendance at the meetings of the school board of trustees. Although the Supreme Court rejected the defendant's claim, it clearly stated that "the defendant's claim would have substance if the transaction involving the Cushing mortgage was encompassed within the field of [the headmaster]'s employment or was within the ambit of the general confidential relationship." Id. at 552. Because the transaction in Taylor was entirely unrelated to the employment relationship between the parties, unlike this case, the defendant's CT Page 5880 reliance on Taylor is misplaced.
"An agent is a fiduciary with respect to matters within the scope of his agency." Taylor v. Hamden Hall School, Inc, supra at 552.
Moreover, an agency relationship is not critical to the creation of a duty of loyalty. Such a duty may arise from a fiduciary relationship which is not strictly a principal-agent relationship, Alaimo v, Royer 188 Conn. 36 (1982). Our Supreme Court has "specifically refused to define `a fiduciary relationship in precise detail and in such a manner as to exclude new situations, choosing instead to leave `the bars down' for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other.'" Id. at 41. Such a relationship is a question of fact reserved for the trial court, Ibid.
Where such a relationship is found to exist, the burden of proving fair dealing shifts to the fiduciary. Id. at 41. The court finds both a principal-agent and a fiduciary relationship between the parties and that the defendant has failed to sustain the burden of proof which has shifted to her in this regard.
C. Fraudulent Non-Disclosure and Misrepresentation
"Fraud by non-disclosure . . . involves failure to make a full and fair disclosure of known facts connected with the matter about which a party has assumed to speak, under circumstances in which there is a duty to speak." Gelines v. Gelines, 10 Conn. App. 167,173 (1987). "A lack of full and fair disclosure of such facts must be accompanied by an intent or expectation that the other party will make or will continue in a mistake, in order to induce that other party to act to her detriment." Id.
"Mere non-disclosure . . . does not amount to fraud." Ducksa v. City of Middletown, 173 Conn. 124 (1977). "To constitute fraud on that ground, there must be a failure to disclose known facts and, in addition thereto, a request or an occasion or a circumstance which imposes a duty to speak." Id. at 127. The non-disclosure must be by a person intending or expecting thereby to cause a mistake by another to exist or continue, in order to induce the other to enter into or refrain from entering into a transaction, Egan v. Hudson Nut Products. Inc., 142 Conn. 344, 348 (1955). In view of the court's finding of an agency and therefore a fiduciary relationship the defendant clearly had a duty to speak to the plaintiff concerning this matter.
Furthermore, "the intentional withholding of information for the purpose of inducing action has been regarded . . . as equivalent CT Page 5881 to a fraudulent misrepresentation," Pacelli Bros. Transportation. Inc. v. Pacelli, 189 Conn. 401, 407 (1983). Allegations of fraud must be proved by clear, precise and unequivocal evidence. Bound Brook Association v. Norwalk, 198 Conn. 660, 666 (1986).
The law demands a high standard of conduct from fiduciaries in situations dealing with non-disclosure. Id. at 408. "It is essential to the validity of the contract between the fiduciary and the beneficiary concerning matters within the scope of that relationship that a full disclosure be made of all relevant facts which the fiduciary knows or should know." Id. at 407-408.
In this case the defendant represented to the plaintiff that she had been attempting to obtain a lease for the past several months but was unable to do so. The plaintiff was in no position to doubt the defendant's words because during this time the plaintiff was either in China or in Georgia. Moreover, before the defendant told the plaintiff on July 27 that she had decided not to buy the business, she had been told by the landlord on July 25 that "the lease is on the way". By her own admission she did not advise the plaintiff of this at the time she gave the plaintiff her decision. Although she justifies this on the grounds that the landlord's statement was nothing more than a vague assurance, as the plaintiff's agent and fiduciary, she had an unqualified obligation to tell her anyway.
The principal dispute in this case rises out of a series of events that began on July 22 and culminated on July 29. On July 22, 1985, acting out of frustration if not desperation, the plaintiff handed the defendant four written options the scope of which ran from buying the business in accordance with their contract to buying nothing. The document required an election of one of the four options by July 27. Between these two terminal dates the parties are in serious disagreement as to what transpired. The plaintiff argues that the evidence shows that the landlord sent a lease to the defendant on or about July 26 after previously receiving from the defendant an accepted proposal containing the basic terms of the lease which the landlord had prepared and sent to the defendant on or about July 15. There was testimony from the landlord's wife that the original July 15 lease proposal had been signed by the defendant and returned to the landlord without the plaintiff's knowledge. The plaintiff says that this is supported by the fact that on July 29 she found only a copy of the July 15 lease proposal on her desk which the defendant had left for her. On the contrary, the defendant testified that she left the original lease proposal on the plaintiff's desk. The defendant argues that proof that what she left on the plaintiff's desk was the original is the fact that the original was not found in the landlord's wife's file. The defendant further claims that there was no lease as distinguished from lease CT Page 5882 proposal and that receipt of the lease proposal on or about July 29 is consistent with the landlord's testimony that she sent the lease "toward the end of July".
This court finds the evidence on this point is unclear and inconclusive. Considerably clearer however are the following two points. First, irrespective of the question of what document was received when by the defendant, it is apparent that the defendant failed to disclose the contents of her July 25 conversation with the landlord. Second, an adverse inference may be drawn by the court from the failure of the defendant to produce the envelope (with postmark) in which the July 15 communication was mailed. The court may draw a negative inference from "the failure of a party to produce physical evidence which is within his power to produce," State v. Alfonso, 195 Conn. 624, 632 (1985). The fact that fourteen days elapsed from the date of the lease proposal to the date on which the defendant claims to have received it would of course have furnished strong reason to retain the original envelope. The defendant opened the envelope at the plaintiff's direction and left its contents for the plaintiff to examine later but failed to include the envelope.
Moreover, the defendant's foot dragging in attempting to obtain the lease until the critical day of July 23 (excess of 3 months) is further evidence of her intent not to complete the transaction.
As indicated above because the exigencies that existed at the time including the fact that the plaintiff's lease was due to expire on August 31, 1985, in a final effort to bring the transaction to conclusion, on July 22, 1985 the plaintiff developed and presented to the defendant an informal list of options from which to choose. By the defendant's own admission these options were predicated in part on the plaintiff's representations that the landlord would give no lease because he might be selling the building. This statement gained plausibility in the face of the defendant's assurance that she had made repeated attempts to obtain the lease while the defendant was out of the country. Such statement was in fact not true. One of the July 22 options contemplated rescission of the contract. The defendant was given until July 27 to select one of the options. On July 25, defendant had a telephone conversation with the landlord who informed her that "a lease is on the way". Nevertheless, she deliberately failed to inform the plaintiff of this conversation. While it may be true that the non-disclosure occurred after the issuance of the options, viz: July 25 v. July 22, nevertheless, the defendant's inaction in negotiating for a lease formed the basis for the issuance of the options and the information which the defendant obtained from the landlord on July 25 formed the basis for her exercise of option number 4, rescission of the contract. CT Page 5883
The defendants argue that because option number 4 gave the defendant the right to rescind the contract the defendant was no longer bound by it. "Rescission or abandonment of contracts, like entry into a contractual relation, depends upon the intent of the parties in that the relevant intent is to be inferred `from the attendant circumstances and conduct of the parties' . . . whether the parties have manifested an intention to modify or abandon their agreement is ordinarily a question of fact". Rowe v. Cormier,189 Conn. 371, 373 (1983). There is ample evidence that but for the defendant's approach to the lease negotiations when coupled with her statements inducing the plaintiff to believe that the landlord was unwilling to give a lease, the July 22 options would not have been presented.
Even if both facts were not present, the defendant's right to rescind was vitiated by her breach of fiduciary duty by failing to disclose the contents of her conversation of January 25 with the landlord.
 Unless otherwise agreed, an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him in which, as the agent has notice, the principal would desire to have and which could be communicated without violating a superior duty to a third person.
Restatement, 2d Agency, Section 381.
The defendant's dual role in seeking a lease ended when the plaintiff decided that she did not wish to go through with the contract and purchase the business but rather wished to pursue the lease on her own. At this point, the defendant still owed a high duty of good faith, loyalty and honesty with regard to any conduct related to the agency. An agent is subject to a duty to act solely for the benefit of the principal and may not compete with the principal concerning the subject matter of the agency. Restatement, 2d Agency, Section 393, Cmt. b.
Acting in the belief that the defendant had betrayed her the plaintiff dismissed the defendant from employment on August 2. On August 5, the defendant wrote a letter to the landlord which included the following statement:
 I had planned to sign the lease and return it to you so that I could start a new CT Page 5884 jewelry business. However, Mrs. Cleta Pergament has changed her decision to close the store and she has forced me to give her the lease which you have directed to me.
This letter is further evidence that the defendant planned to start a new jewelry business at the landlord's premises rather than purchase the existing business from the plaintiff.
The defendant claims that once the plaintiff fired the defendant she owed no duty to the plaintiff and was entitled to pursue the lease for her benefit. While there may be some validity to this proposition as a general rule, as stated above, the facts in this case indicate that the defendant's plan to pursue the lease for her own benefit began long prior to the date of termination.
Two other events occurred which solidifies the court's conclusion in this regard. When the July 15 lease proposal arrived in the mail the defendant contacted her attorney for advice as to whether it was appropriate for her to even open the letter. Considering all the circumstances, the court believes that the defendant contacted the attorney because she wished to obtain legal advice on how best to carry out her scheme to disavow the contract and acquire the lease for herself
The other event involves the defendant agreeing to act as the landlord's "temporary agent" for the purpose of evicting the plaintiff from the premises. In fact, the defendant recommended to the landlord an attorney to represent him in the summary process action and then split the attorneys' fees incurred in the action. The defendant justifies this action on the grounds that once the plaintiff terminated her she no longer owed any duty to the plaintiff. The court views this particular activity as the culmination of the bad faith that characterized the defendant's behavior from the beginning.
The court finds that the plaintiff has sustained her burden of proving by clear, precise and unequivocal evidence that the defendant's non-disclosure and material misrepresentation constitute fraud.
III. The Unfair Trade Practices Act
The plaintiff claims that the defendant's conduct constituted a violation of the Unfair Trade Practices Act. In determining whether conduct violates Section 42-110(b), Connecticut's courts generally consider three factors: (1) whether the practice, without necessarily having been established by the statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory or other CT Page 5885 established concept of fairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; and (3) whether it causes substantial injury to consumers (or competitors or other businessmen). Web Press Services Corp. v. New London Motors. Inc.,205 Conn. 479, 482 (1987).
The first issue that arises under CUTPA is whether the statute applies to a single transaction such as the purchase and sale of a business. Lacking guidance from a Connecticut Appellate tribunal this court finds direction in the legislature's avowed purpose that CUTPA be "remedial and be so construed". This court believes that there is nothing in CUTPA or in any case law decided to date which indicates any need to prove more than a single act to constitute a general business practice. Judge v. House Masters of America,2 CSCR 421 (Gil, J.). Thus, the CUTPA claimant need not prove a general course of conduct. Student v. Cordascio, 2 CSCR 382: Connecticut Light and Power Company v. Panaressa, 2 CSCR 160. Such a result is consistent with the language of Section 42-110g(a) which employs the singular terms "method, act or practice" as opposed to the plural language of Section 42-110b. In arguing for the non-applicability of the statute the defendant has cited several decisions which deal with isolated real estate transactions by individuals not acting in a business context. In the present case however, the parties were selling and buying a business, not a home. The defendant further urges the court to consider the body of case law developed in the State of Massachusetts which has long had an unfair trade practices act which is virtually identical to Connecticut's. The court accepts that invitation but reaches a contrary result. In the case, which have been decided since Lantner v. Carson, 373 N.E.2d 973 (1978) the Massachusetts appellate courts have held that its act applies to the one time purchase and sale of a business by private individuals. See, Lynn v. Nashawaty, 423 N.E.2d 1052 (1381). In Begelfer v. Najarian,409 N.E.2d 167 (1980), the court held that whether an isolated transaction takes place in a business context must be determined by the circumstances of each case. There, the court did not read the act as requiring that a commercial transaction take place only in the ordinary course of the person's business or occupation before participants may be subject to liability under the act. And so it is found that this defendant engaged in unfair and deceptive acts for which the plaintiff suffered ascertainable loss.
DAMAGES
The extent to which the plaintiff may recover damages is determined by a) those damages which flow from the breach of contract, b) the breach of fiduciary duty, c) the fraud and d) CUTPA. It is fundamental that "a plaintiff who alleges separate causes of action is not permitted to recover more than the amount of damages actually suffered". 22 Am.Jur.2d Damages 35. Thus, CT Page 5886 a plaintiff who recovers the full amount of damages for a breach of contract cannot recover damages in tort unless he alleges and proves the existence of additional damages attributed solely to the tort" Ibid.
Under the breach of contract claim damages are based on the plaintiff's expectation interests and are intended to give her the benefit of the bargain by awarding a sum of money that will, to the extent possible, put her in as good a position as she would have been in had the contract had been performed. Danpar Associates v. Summersville Mills Salesroom, Inc., 182 Conn. 444, 446 (1980). Otherwise stated, the measure of damages is the actual loss sustained by reason of the breach, which is the loss of what the promisee would have made if the contract had been performed, less the proper deductions. Such damages are measured from the date of the breach, Keppel v. BaRoss Builders, Inc., 7 Conn. App. 435
(1986).
These principles are subject to the duty by which the non defaulting party has to mitigate the damages occasioned by the defendant's breach. Willametz v. Goldfeld, 171 Conn. 622, 627
(1976). "The doctrine of avoidable consequences is simply one of good faith and fair dealing. The injured person need not make extraordinary efforts to minimize damages; reasonable diligence and ordinary care are all that is required to allow full recovery of all damages caused by the defendant's wrongful activities and this is a question of fact. 22 Am.Jur.2d Damages 497. As to tort damages, a principal is entitled to recover from an agent for any losses associated with a breach of the agent's duty to the principal. Restatement, 2d Agency, Section 401.
However, since the actual damages recoverable due to the breach of fiduciary duty are the same as the actual damages recoverable due to the breach of contract there is no need to evaluate these damages separately. The damages recoverable for fraudulent representation are those damages which are presumed to have been within the contemplation of the defendant as the probable consequence of his fraudulent representation, Miller v. Appleby,183 Conn. 51, 58 (1981). In other words, damages are restricted to those which might foreseeably be expected to flow from the character of the representation Id. at 58. Finally, under 42-100g(a) if the plaintiff shows that she has suffered an ascertainable loss she can recover actual damages.
Before analyzing the plaintiff's damages under all three theories some discussion of the plaintiff's request for an award of punitive damages is necessary. Recognizing that punitive damages are generally recoverable only if authorized by statute, the plaintiff argues that in view of the defendant's egregious conduct punitive damages are mandated. On the contrary, awarding punitive CT Page 5887 damages under CUTPA is discretionary. General Statutes, Section 42-110g(a). "In order to award punitive damages evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of these rights. In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence". Gargano v. Heyman, 203 Conn. 16, 622
(1987). While the court believes that there is ample evidence that the defendant acted in bad faith and was motivated by self aggrandizement the court does not believe that this conduct rises to a level which warrants an award of punitive damages.
Applying the foregoing principles to the facts of this case, the following sums are awarded to the plaintiff. We begin with the contract price of $95,000 of which the plaintiff received $475 in the form of a binder. By the plaintiff's own testimony she was left with $50,000 in inventory at cost. Of this sum approximately $20,000 of stock remained on hand as of the time of trial. The remaining $30,000 was disposed of either through her sporadic sales conducted at her home after she was evicted from the store premises or through the Savannah store which she opened after losing the New Canaan store. There is no evidence by which the court could apportion the sum between New Canaan and Savannah. There was evidence however, that the $30,000 worth of inventory was of no ultimate value to the plaintiff because in order to sell it the plaintiff was forced to incur expenses in opening the Savannah store which exceeded its value. The plaintiff is however chargeable with the $8,000 in trade fixtures which she utilized to set up the Savannah store. Thus the plaintiff has suffered a gross loss of benefit of the bargain in the amount of $66,525. To this the plaintiff seeks to add consequential damages which ensued from the defendant's default, the principal one of which is $27,018 for leasehold improvements to the Savannah store. Even applying the more liberal rule of damages found in Miller v. Appleby, supra, the court is unable to say that these improvements where a foreseeable consequence of the defendant's conduct. On the contrary, the other expenses consisting of $2,023.50 in advertising the going out of business sale, $468 in going out of business permits, $1,175 in attorneys fees incurred in defending the eviction and $2,088.11 in the rental of furniture which she needed to permit her to remain in Connecticut to sell off inventory were foreseeable. These sums are also justified in that they were reasonably incurred in mitigation of the plaintiff's damages, Restatement, Contracts, 2d Section 347(b). The total amount of these damages is $5,754.61 which when added to the previous figure of $66,525 yields $72,279.61 which is the amount of compensatory damages hereby awarded to the plaintiff.
The plaintiff requests that the court award prejudgment interest at the statutory rate of 10%, Section 37-3a. The CT Page 5888 allowance of interest as an element of damages is within the discretion of the court. Bertozzi v. McCarthy, 164 Conn. 463, 467
(1973). Whether to include interest as damages is an equitable determination for the trial court and interest may be awarded at the statutory rate from the time the money becomes due. Neidtiz v. Morton S. Fine and Associates, Inc., 2 Conn. App. 322, 329 (1984). The court finds that the interest at the statutory rate of 10% per annum is appropriate under the circumstances of this case. Interest should run on the sum of $66,525 from July 27, 1985 (the date on which the defendant manifested her breach by informing the plaintiff that she no longer wished to buy the business) to date. On the balance interest should commence from January 1, 1986 which is the date by which the consequential damages were paid. The parties are ordered to submit their interest calculations forewith in anticipation of a supplemental judgment.
Finally, the plaintiff asks the court to award reasonable attorneys fees as authorized by 42-110g(d). In view of the nature of the defendant's conduct the court believes that reasonable attorneys fees and costs of litigation ought to be awarded. The defendant is ordered to file within two weeks an affidavit of service performance with accompanying contemporary time records for this purpose. If the parties cannot agree on the fee the parties are ordered to appear before the court for an evidentiary hearing.
MOTTOLESE, J.