[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I
This is a contracts dispute. The plaintiff, Lifeline Products, Inc. ("Lifeline") by complaint filed September 16, 1994 brings suit against the defendant, Blue Cross Blue Shield of Connecticut, Inc. (Blue Cross" or "BC BS"). The plaintiff's complaint is in three counts; Count I alleges breach of contract; Count II alleges breach of an implied covenant of good faith and fair dealing; Count III alleges violation of the Connecticut Unfair Trade Secrets Act ("CUTPA"), General Statutes, Section42-110a et seq. CT Page 9189
Defendant answered, denying liability, and a hearing opened on December 4, 1997, continued on December 16th, 19th, 23rd, 24th, January 22, 1998, and the parties rested on January 29th. Briefs were filed, and oral argument was had on March 30, 1998.
 II
Lifeline is a small business, which in the period 1989-1991, was engaged in the manufacturing and wholesale distribution of hypodermic syringes. Blue Cross is, inter alia, a provider and underwriter of group health insurance. The American Association of Industrial Management ("AAIM") was, during the relevant time period, a non-profit employer association, offering services to the manufacturing businesses who joined the association. Among those services was the provision of group health insurance plans, underwritten by Blue Cross. AAIM utilized Capital Benefits Plans, Inc. ("CBP") as administrator of the group health plans it sponsored. AAIM offered its members coverage, utilizing its vehicle, Community Action Health Insurance Trust ("CAHIT") as the party contracting with AAIM members.
AAIM and Blue Cross had entered into a contract on or about January 1, 1986, whereby Blue Cross issued a "master group policy" to AAIM (Plaintiff's Exhibit Q). AAIM paid Blue Cross a monthly premium on a per capita basis and Blue Cross in turn provided health care insurance coverage to employees and families of association members. Typically, AAIM did not identify its employer members to Blue Cross, treating such information as proprietary.
Under the agreement between AAIM and Blue Cross there were no restrictions on the number of people to be enrolled in a given employer's group. By Spring of 1989, Blue Cross decided to amend its underwriting guidelines to restrict associations, allowing them to enroll only member groups of ten or fewer employees.
Paragraphs 5.1 and 5.2 of the above-cited agreement between Blue Cross and AAIM read:
 "5.1 BC BS reserves the right to amend this Agreement upon at least 30 days prior written notice to Association. BC BS agrees to notify Association of any change or amendment to this Agreement, its Association Underwriting requirements, Stop Loss Coverage, or Group Merit Rating Program within 30 days prior to the effective date of the change or amendment. CT Page 9190
 "5.2 This agreement shall remain in force for the duration of the Master Group Policy between Association and BC BS, and shall automatically terminate upon termination of the Master Group Policy by either party.
Paragraph 6.1 of the agreement read:
 "6.1 Association is the agent of its Participants and Members, and is not an agent of BC BS with regard to any action taken under this Agreement or Master Group Policy."
By letter dated April 21, 1989, defendant notified AAIM of its intention, inter alia, impose a group size limitation on new employer members of AAIM and other associations, effective August 1, 1989 (Defendant's Exhibit #2).
 III
At some time prior to 1986 Blue Cross had contracted with various employer associations to underwrite group health plans for association members. By 1988, Blue Cross became concerned that it was losing control of the association business and that measures had to be taken to bring this aspect of their business under some sort of control. Specifically, as later stated (Defendant's Exhibit #3), Blue Cross sought to "[control] losses and [combat] cherry picking by groups between the association program and other group insurance products sponsored by BC BS." By Spring of 1989, Blue Cross had decided, inter alia, to embark on a policy of limiting participation in association-sponsored health plans to groups of ten or less employees. (See Defendant's Exhibit #1 and #2 of defendant's proposed measures).
Stemming from that decision two related series of events, occurring during the period April of 1989 to March of 1990, moved forward, their intersection resulting in this law suit.
In April, 1989 Blue Cross had notified the associations concerned of its intent to amend their contracts, including amendment of the underwriting guidelines to limit group sizes of new members to ten or fewer employees. This proposal met with dissatisfaction and resistance from some, at least, of the associations, including AAIM. The initial date of the implementation, August 1, 1989, slipped, while Blue Cross and association representatives discussed the change. A meeting was convened on August 8, 1989 at Blue Cross with representatives of CT Page 9191 AAIM and other associations amending. Mr. Torello, defendant's chief operating officer, headed his company's delegation.
By letter dated September 5, 1989, Blue Cross' Associate General Counsel, Alford R. Jarvis, sought to summarize Blue Cross' position on various issues raised at the August 8th meeting. With regard to limitations on the size of enrolled groups. Mr. Jarvis stated:
"...we have decided to implement the requirement limiting the size of groups [enrolled in the plan] to ten or fewer immediately upon enrollment. However, the new restriction will permit enrolled groups to grow up to an aggregate of fifteen employees. Any group having in excess of fifteen employees on any date would have a period of sixty (60) days in which to reduce the total number of employees to fifteen or fewer. If the group was not in compliance with the restriction after expiration of this period, the insurance coverage under the association program for that group would be terminated and it would be offered a conversion to a standard group benefit plan sponsored by BC BS..."
"The new underwriting restriction will be phased in for groups enrolled in the BC BS association program prior to September 1, 1989."
"The due date for submission of all executed Agreements has been extended to September 3, 1989. Please note that all presently enrolled groups must execute and deliver a copy of the Application on or before October 30, 1989. (Defendant's Exhibit #3).
During the Fall of 1989, Blue Cross continued to press associations to comply with the new guidelines. The outcome of this dispute can be traced in documents admitted into evidence.
By letter dated November 1, 1989, (Plaintiff's Exhibit R), Mr. Fox, President of AAIM warns that AAIM:
"will pursue legal claims against BC BS for its anticompetitive conduct if it cancels our program because of our refusal to take part in this illegal course of conduct."
By letter dated December 29, 1989, (Plaintiff's exhibit S) Mr. Fox writes to Mr. Massicote of Blue Cross: CT Page 9192
"This note is just to confirm our telephone discussion of Wednesday, December 27, 1989 in which we agreed to rescind the January 31, 1990 deadline set forth in your December 22 letter to our Third Party Administrator...pending receipt of information from your outside counsel on the legality of the 10 employee enrollment size restriction that Blue Cross is seeking to impose."
By letter dated March 6, 1990 (Plaintiff's Exhibit T), Mr. Fox writes to Mr. Howard, Vice President of sales of Blue Cross:
"Based on the ultimatum given us at our February 26, 1990 meeting of facing immediate cancellation of our AAIM group health insurance program, we have no choice but plans to reluctantly agree to abide by your April 21, 1989 letter to our Third Party Administrator which among other things, limits new group enrollments in existing association pans to groups of 10 or fewer employees."
Mr. Fox then proceeds to list thirteen employer members of AAIM whose applications were "written, submitted and accepted by our association after August 1, 1989 in good faith upon the representations of Blue Cross officials including Blue Cross counsel, that until such time as a final revised group enrollment agreement was executed, the terms of the old contract would govern.
 The list submitted by Mr. Fox included Lifeline. Finally, by letter dated March 8, 1989, (Plaintiff's Exhibit U) Mr. Fox writes to Carol Pinto, President of Lifeline:
"Regretfully, I must advise you that Blue Cross/Blue Shield of Connecticut has determined that your firm's participation in the
AAIM sponsored group health insurance program is to be terminated effective April 30, 1990 due to their implementation of new group size restrictions on association insurance programs."
 IV
In 1989 the plaintiff, Lifeline, maintained group health coverage for its employees through a program sponsored by Aetna/CBIA. Lifeline employed seventeen people at this time. Lifeline's President, Carol Pinto had obtained coverage through Joseph Costelli, a licensed insurance broker. Blue Cross had CT Page 9193 appointed Mr. Costelli an insurance agent, authorized to offer to his clients the insurance policies and products of the defendant. From time to time Mrs. Pinto would consult Mr. Costelli, to determine if there might be alternatives to the current coverage, which might be less expensive or otherwise more, satisfactory than Aetna/CBIA. The two met and discussed insurance several times during that summer. Mrs. Pinto was concerned with possible cost increases for coverage. Her husband, covered under the existing policy, had recently suffered serious health problems and she was concerned with the impact of this development on cost and ability to obtain satisfactory coverage. Mr. Costelli undertook to inquire as to possible alternatives and in the course of his investigation became aware of the AAIM program. Costelli contacted CBP, AAIM's administrator, and was told that AAIM had "association rates" but was currently negotiating with Blue Cross over the issue of group size limitation. Blue Cross might restrict group size to ten "lives".
Subsequently, Costelli talked to CBP again. Costelli was told the contract (between AAIM and Blue Cross) had not been amended, that they "could do more than ten lives" and that Costelli should go ahead and get applications ready.
In September of 1989 Costelli recommended to Mrs. Pinto that she "hold off" until the end of the year, then meet for further discussion.
In January of 1990 Costelli met again with Pinto. Costelli contacted CBP and was told he was free to file an application for participation by plaintiff. (It is unclear why AAIM chose not to alert Lifeline to the risk of cancellation). Costelli then filled out the application for participation (Plaintiff's Exhibit A) in the presence of Mrs. Pinto and oversaw preparation of individual employee applications for group membership. (Plaintiff's Exhibit B). The application for participation was signed on February 13, 1990, requesting an effective date for coverage of March 1, 1990.
CBP forwarded its notice of acceptance (Plaintiff's Exhibit C) with an effective date of March 1, 1990, to plaintiff, which received the notice on February 27, 1990. On receipt of said notice Mrs. Pinto forwarded a letter to CBIA, terminating Aetna/CBIA coverage, effective March 1, 1990.
By letter dated March 6, 1990 Mr. Chain of CBP wrote to Mrs. CT Page 9194 Pinto:
"In accordance with a directive from Blue Cross/Blue Shield limiting the size of acceptable groups for Association-Sponsored Plans including the AAIM Health Insurance Program, this letter gives you formal notice of cancellation of your group's participation in our program as of April 30, 1990."
"Please contact your agent for alternative coverages available to you as of May 1, 1990...". (Plaintiff's Exhibit K).
Faced with this situation Costelli "had to scramble" to obtain group health coverage for the plaintiff. By letter dated April 11, 1990, Aetna/CBIA declined to provide coverage, stating that plaintiff "does not meet Aetna/CBIA's underwriting guidelines." (Plaintiffs's Exhibit L). After contacting several providers Costelli arranged for direct Blue Cross group coverage for plaintiff commencing May, 1990 and continuing through September, 1991, when plaintiff obtained M.D. Health Plan coverage.
In summary, plaintiff applied for AAIM group health coverage on February 13th, received a notice of acceptance on February 27th, and was terminated from the program by letter dated March 8th to be effective April 30th, 1990.
Plaintiff claims that defendant Blue Cross' course of conduct, as described above, constituted a breach of its contract, express or implied, with Lifeline; breached defendant's implied covenant of good faith and fair dealing with plaintiff; and that said conduct by defendant constitutes unfair trade practices in violation of CUTPA, General Statutes, Section42-110a et seq. Plaintiff claims damages stemming from the increased costs claims plaintiff incurred for coverage following cancellation of its participation in the AAIM-sponsored plan.
Plaintiff's contention is complex, vehemently pressed and, ultimately, unpersuasive. The threshold question is: Was there a contract in effect between plaintiff and defendant, which defendant breached by the course of conduct described, supra?
The complexity stems from the intricate and interwoven relationships among the entities and individuals involved: Blue Cross, Lifeline, Lifeline employees, AAIM, CBP, Costelli, CAIT. As one commentator has observed, "...most parties interested in a CT Page 9195 group insurance relationship, could, as a general rule, be found to be acting as the agent of just about any party that might also be interested in that insurance relationship", Couch on Insurance 3d, S.8.8.
Count I alleges that, "On or about March 8, 1990, the Defendant breached its agreement with the Plaintiff to provide the Plaintiff with said group health insurance coverages in that the Defendant, acting by and/or through its authorized agents, employees or representatives, unilaterally terminated its agreement with the Plaintiffs without prior warning or notice."
The court is satisfied that during the relevant period there was a contract in effect between defendant Blue Cross and AAIM. The court finds that Lifeline entered into a contractual relationship with AAIM in AAIM's capacity or group health plan sponsor. The court recognizes that Blue Cross, so long as it provided coverage to plaintiff's employees, had obligations to said employees. The plaintiff, however, has failed to establish, by a fair preponderance of the evidence, that the defendant, Blue Cross had a contract, written or oral, express or implied, with the plaintiff, Lifeline, which contract defendant breached by the course of conduct described, supra, or by any act or omission alleged against the defendant. There being no such contract, there could nor be a breach of same. Nor was there a breach by defendant of an implied covenant of good faith and fair dealing with plaintiff; nor, consequently, was there a violation by defendant of CUTPA.
 V
The plaintiff argues that in enrolling the plaintiff in its group health plan AAIM was acting as defendant's agent, clothed with authority, apparent, if not actual, to bind Blue Cross "in the issuance of the plaintiff's group health insurance coverage."
Agency is the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. (2) The one for whom action is to be taken is the principal. (3) The one who is to act is the agent. Restatement (Second), 1 Agency S. 1, McLaughlin v. ChickenDelight, Inc., 164 Conn. 317, 322. A principal is generally liable for the authorized acts of his agent, Gateway Co. v. DiNoia,232 Conn. 223, 240. The agency relationship must be proved by a CT Page 9196 fair preponderance of the evidence. Chieffalo v. Norden Systems,Inc., 49 Conn. App. 474, 478 (citations omitted).
There is no doubt that Blue Cross, by the terms of its contract with AAIM, bound itself to provide group health insurance coverage to AAIM members' employee groups, but reserved the right to amend the contract with AAIM upon thirty days' written notice. Either AAIM or Blue Cross could terminate the Master Group Policy and the Agreement (Plaintiff's Exhibit Q). Plaintiff correctly notes that the existence of agency is a questions of fact to be determined by the trier of fact. Some of the factors to be considered in assessing whether an agency relationship exists includes: whether the alleged principal has the right to direct and control the agent; whether the agent is engaged in a distinct occupation; whether the principal or the agent supplies the "instrumentalities, tools and the place of work"; and the method of paying the agent. Id. (citations omitted). In addition, [a] essential ingredient of agency is that the agent is doing something at the behest and for the benefit of the principal (citations omitted), Bechenstein v. Potter Carrier, Inc., 191 Conn. 120, 133.
The court finds that the plaintiff has failed to establish, by a fair preponderance of the evidence, that AAIM, in enrolling plaintiff in its group health plan, or in cancelling plaintiff's participation was acting as defendant's agent, clothed with the authority to bind the defendant.
First, paragraph 6.1 of the agreement (Plaintiff's Exhibit Q) is explicit:
 "Association is the agent of its Participants and Members, and is not an agent of BC BS with regard to any action under this Agreement or the Master Group Policy."
While this, alone, is not dispositive of plaintiff's claim of agency, it evidences the intent of the contracting parties, AAIM and Blue Cross, that AAIM not act as defendant's agent.
Second, the court finds that AAIM, in entering its agreement with Blue Cross by which Blue Cross would underwrite the AAIM-sponsored group health insurance, sought to provide a service for its members, thus making AAIM membership more attractive. AAIM was not employed by Blue Cross nor paid compensation by Blue Cross, for this service. AAIM's goal, in contracting with Blue CT Page 9197 Cross, was not to serve Blue Cross' interests, but the interests of AAIM and its members. See the same rationale, as applied to employers acting as master policy holders for group health insurance in Boseman v. Insurance Co., 301 U.S. 196, 204-05;57 S.Ct. 686, 690; 81 L.Ed. 1036, 1041 (1937).
Third, there was no evidence that AAIM, CBP or CAHIT held themselves out as agents of Blue Cross, nor that Blue Cross held AAIM out as its agent.
Fourth, AAIM's utilization of CBP as its third party administrator, and Blue Cross' reliance on CBP as its point of contact with regard to association-sponsored health insurance, does not convert CBP into defendant's agent.
Finally, AAIM, in its resistance to the Blue Cross effort to introduce group size limitations on its coverage, did not comport itself as an agent, carrying out the will of its principal. By late summer of 1989, Mr. Costelli had been made aware that this was an issue between AAIM and Blue Cross and conveyed this information to plaintiff's president, Mrs. Pinto. The evidence indicates that this dispute intensified during the period November, 1989 through February, 1990. By March, 1990 AAIM was facing hard choices. The court finds that AAIM, in cancelling plaintiff's participation in March, 1990, acted in what it saw as AAIM's interests, not for the benefit of Blue Cross. The court notes that by the end of 1991, AAIM, acting in what it presumably saw as its best interests, cancelled its policy with Blue Cross.
The plaintiff has failed to show, by a fair preponderance of the evidence, that AAIM, in offering plaintiff coverage in February, 1990, acted as defendant's agent, nor that AAIM, in canceling plaintiff's participation in March, 1990, acted as defendant's agent.
Alternatively, plaintiff argues that the certificates issued by defendant for plaintiff to issue to its employees evidence the terms of the contract between plaintiff and defendant. Or, plaintiff adds, if the certificates were not written contracts, they were written evidence of the terms of an oral contract between the defendant and the plaintiff on behalf of its employees. The plaintiff's claim is without merit. The certificates in question are certificates of membership issued to the employees of plaintiff covered by the group insurance policy issued by Blue Cross to AAIM. The certificates contain the CT Page 9198 principal provisions of the group policy and its schedule of benefits. While the certificates recite certain obligations of defendant to individual employees and vice versa, so long as coverage is in force, they do not constitute a contract between plaintiff and defendant. Plaintiff is nowhere mentioned in said certificate. At the time of issuance there is no reason to believe that Blue Cross was aware the certificate holders were employees of plaintiff.
The court notes in passing the following provisions of the certificates:
Section GP-General Provisions, subsection B. TERMINATION OF YOUR COVERAGE UNDER THE GROUP POLICY, Paragraph 2, reads, in pertinent part, "Termination of the policy automatically ends all of your coverage. It is the responsibility of your Group to tell you of such termination." And, "If we, acting alone, terminate or amend the policy..." An insurance carrier terminating coverage upon due notice, is hardly unparalleled in the annals of insurance. The certificates do not constitute a written contract between the defendant and the plaintiff, breached by the defendant. Nor do the certificates constitute evidence of an oral contract between plaintiff and defendant, breached by the defendant.
 VI
In its Count II, plaintiff alleges that, "On or about March 8, 1990 the Defendant breached its implied covenant of good faith and fair dealing in providing the Plaintiff with said group health insurance coverage in that the Defendant, acting by and/or through its authorized agents, employees and/or representatives unilaterally terminated its agreement with the plaintiff without prior written notice or warning to the Plaintiff or the Defendant's own authorized agents, servants, employees and/or representatives." Thus, plaintiff bases this claim squarely on its allegation that defendant violated its contract with plaintiff.
Every contract imposes upon each party a duty of good faith and fair dealing in its performance and in its enforcement,Warner v. Konover, 210 Conn. 150, 154 (citation omitted). An implied covenant of good faith and fair dealing is essentially a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably CT Page 9199 intended, Eis v. Meyer, 213 Conn. 29, 36-7.
This court has found no contract existing between plaintiff and defendant, breached by any action or omission by plaintiff on or about March 8, 1990 or at any other time. This court has found that AAIM, in notifying plaintiff of AAIM's cancellation of plaintiff's participation, did not act as defendant's agent. Accordingly, the court finds that plaintiff has failed to establish, by a fair preponderance of the evidence, that Blue Cross breached an implied covenant of good faith and fair dealing toward Lifeline.
The plaintiff alleges also that defendant further breached its implied covenant of good faith and fair dealing with plaintiff "in that, after unilaterally terminating its agreement without prior notice or warning to the Plaintiff, the Defendant failed to offer to or arrange for the Plaintiff comparable or similar group health insurance coverage from March, 1990 to the present [later limited to September, 1991] at rates comparable with or similar to its Association-sponsored group health insurance plans." Plaintiff terms defendant's conduct "an arbitrary abuse of discretion" but cites no statute, contract provision or case law which requires or suggests such a burden be imposed on the defendant. Plaintiff's citation to Eis v. Meyer, supra, at 37, is inapposite; that opinion's reference to Warner, supra, as holding that "implicit in the terms of the lease was that the landlord's discretion must be exercised in a manner consistent with good faith and fair dealing", was predicated on the existence of a contract between the parties, granting the landlord such discretion. The court finds that the plaintiff has failed to establish, by a fair preponderance of the evidence, a duty on the part of the defendant, to offer or arrange for the plaintiff comparable or similar group health insurance coverage, following plaintiff's cancellation from participation in the AAIM-sponsored plan.
 VII
Count III alleges that defendant's conduct, in breaching its implied covenant of good faith and fair dealing to the plaintiff, constituted an unfair or deceptive trade practice, in violation of Section 42-110a et seq of the Connecticut General Statutes. The conduct complained of is precisely that alleged in Count 11, namely that, "On or about March 8, 1990, the Defendant breached its implied covenant of good faith and fair dealing in providing CT Page 9200 the Plaintiff with said group health insurance coverage in that the Defendant, acting by and/or through its authorized agents, employees and/or representatives, unilaterally terminated its agreement without prior notice or warning to the Plaintiff, or to the Defendant's own authorized agents, servants, employees and/or representatives, and in that after terminating its agreement without prior notice or warning to the Plaintiff, the Defendant failed to offer or arrange for the Plaintiff comparable or similar group health insurance coverage from March, 1990 to the present at rates comparable with, or similar to its association-sponsored group health insurance plans."
General Statutes, Section 42-110b(a) provides that "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In determining if an act or practice is unfair or deceptive Connecticut law applies the so-called "cigarette rule."
(1) Whether the practice, without necessarily having been previously declared unlawful, offends public policy as it has been established by statutes, the common law or otherwise-whether, in other words, it is within at least the penumbra of some common law, I statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous, (3) whether it caused substantial injury to consumers...", Conway v. Prestia,191 Conn. 484, 492-3.
Plaintiff's CUTPA claim stems from the same course of conduct by defendant which the court has found constituted neither a breach of contract nor a breach of an implied covenant of good faith and fair dealing by defendant. The court finds that the plaintiff has failed to establish, by a fair preponderance of the evidence, that the defendant engaged in an unfair or deceptive act or practice as alleged.
 VIII
The plaintiff, Lifeline Products, Inc., has failed to establish the allegations of Counts I, II and III of its Complaint. Accordingly, the relief requested is denied, and judgment may enter for the defendant, Blue Cross and Blue Shield of Connecticut, Inc.
By the Court CT Page 9201
Downey, J.